Filed 12/31/13  In re I.O.. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re I.O., a Person Coming Under the Juvenile Court Law. | B249624 |
| | (Los Angeles County Super. Ct. No. CK87805) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

California Appellate Project, Jonathan B. Steiner, Executive Director, and Anne E. Fragasso, Staff Attorney, under appointments by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

C.R. (mother) appeals from the dependency court's May 16, 2013 order terminating her parental rights under Welfare and Institutions Code section 366.26[1] and selecting adoption as the permanent plan for her daughter, I.O. Mother contends the trial court erred when it terminated her parental rights and when it prevented her from testifying about I.O.'s relationship with maternal relatives. We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother and I.O. came to the Department of Children and Family Services' attention on May 6, 2011, through a referral alleging that mother used drugs and neglected I.O. When a social worker went to the address, she found I.O. playing in the front yard of a house. I.O. had dust and dirt on her face. The social worker asked to see mother. I.O. took her back to a small wooden shed that served as home for mother and I.O. The shed had no electricity, plumbing, bathroom, or kitchen. Mother appeared to be under the influence of drugs. While the social worker was talking to mother, a friend took I.O. away, preventing the Department from detaining I.O. on that day.

On May 9, 2011, mother brought I.O. to the Department as instructed, and I.O. was detained. A social worker observed that I.O. "appeared parentified as evidenced by her trying to comfort mother when mother became tearful due to the detention of the child." I.O. was comfortable with strangers and was not upset when the social worker explained her detention. When I.O. arrived at her foster home, "she expressed joy for having a room and her own bed. Out of excitement, the child exclaimed to [the social worker]—'Will you tell my mom that I have all of this!'"

I.O. described the living conditions before her detention, explaining that she sometimes had to climb through a window into the main house to use the bathroom and also had to defecate into a bucket. She slept in a "blanket bed" on the floor, while mother

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated. The section 366.26 hearing is referred to as the permanency hearing.

2

and mother's boyfriend slept on a real bed. She was sometimes hungry and would wake mother up to let her know. She reported that mother would sometimes spank her on the buttocks very hard. Mother explained that I.O. (age 5 at the time of detention) was not enrolled in school because father had destroyed I.O.'s birth certificate, and mother made no attempt to obtain a new birth certificate.

On May 12, 2011, the Department filed a petition under section 300, subdivisions (b) and (g), alleging that mother has a history of substance abuse, currently uses illicit drugs, and is unable to provide I.O. with regular care and supervision; mother and child reside in a six-by-seven foot shed with no running water, no bathroom, plumbing, electricity, or cooking area; J.O., presumed father of I.O.,[2] has a history of drug abuse and drug convictions; father has another child who is a dependent of the court; and father has failed to provide I.O. with food, clothing, shelter, or medical care. At the detention hearing, the dependency court appointed counsel for mother, ordered I.O. detained, and gave the Department discretion to place I.O. with any appropriate relative. The court also ordered reunification services for both parents and monitored visitation three times a week, three hours per visit.

On July 14, 2011, parents reached a mediated agreement with the Department. The dependency court declared I.O. a dependent under subdivision (b) of section 300, ordered monitored visitation to continue; gave the Department discretion to liberalize visits to include overnight and weekends while mother was in a residential treatment program; parents to submit to drug and alcohol testing every other week and random testing; participate in drug and alcohol counseling; and take parenting classes. I.O. would remain in foster care, but the Department would evaluate maternal and paternal relatives for possible placement.

Mother began inpatient drug treatment on July 5, 2011, but she was critical of the program, lacked insight into the impact drug abuse had on her life, and wanted to leave the program because her daughter could not reside with her at the inpatient facility. The

---

[2] Father is not a party to this appeal.

program only allowed two-hour weekly visits. Mother was discharged from the program on August 31, 2011, because she failed to follow program guidelines and engaged in inappropriate conduct with others in the program. She later enrolled in an outpatient drug treatment program.

The Department evaluated relatives for placement, but encountered obstacles. For example, maternal grandfather refused to submit to live scan fingerprinting, and paternal great grandmother was not an option because father was living with her and she was in poor health and would have difficulty transporting I.O. to and from school. I.O. was happy and well-adjusted in her foster home placement. Mother had weekly monitored visits with I.O. at the park.

At the six-month review hearing on January 11, 2012, the court ordered the Department to continue providing reunification services to parents. The Department contacted mother in April 2012 to explain the court orders and to arrange parenting classes and drug and alcohol testing. There is no evidence mother enrolled in a parenting class, and she failed to appear for drug testing multiple times. Mother stated to a social worker that she does not see herself reunifying with I.O.

After efforts to approve various relatives for placement proved unsuccessful, the Department placed I.O. with her paternal aunt in July 2012. Paternal aunt (Mrs. B.) and her partner (Mr. G.) both have expressed their willingness to adopt I.O. from the first contact by the Department and have not wavered in their commitment to do so.

Both maternal grandmother and maternal aunt were approved to monitor mother's visits with I.O. Mother visited I.O. only sporadically while I.O was living with a foster mother. Mother's calls to I.O. ranged from once a week to two or fewer times a month. After I.O. began living with Mrs. B., mother visited I.O. every other weekend for six-hour visits. I.O. returned home crying after her first visit because she wanted to stay with mother but was happy after all other visits.

The dependency court terminated reunification services at a 12-month review hearing on August 23, 2012, finding that neither mother nor father were in compliance with the case plan. The court scheduled a permanency hearing under section 366.26.

4

Between August and December 2012, mother continued to visit I.O. every other week for six hours. I.O was happy living with Mrs. B. and Mr. G. She enjoyed school, has a lot of friends, and has a positive relationship with her cousins (her caregiver's children).

On December 20, 2012, the dependency court continued the permanency hearing to permit the adoptive home study to be completed. The court identified adoption as the goal for I.O. Based on a request from mother, the court also directed the Department to explore the option of an open adoption, permitting continued contact between I.O. and her parents.

The Department discussed with Mrs. B. and Mr. G. the idea of maintaining contact with I.O.'s maternal family members, offering to refer the matter to a program that could help negotiate a Postadoption Contact Agreement, but Mrs. B. and Mr. G. did not feel it was needed. They were open to informally maintaining relationships with I.O.'s extended maternal family as long as the individuals respected their boundaries and did not present any safety issues.

At the permanency hearing on May 16, 2013, the dependency court admitted the Department's reports dated December 20, 2012, February 21, 2013, and May 16, 2013. Mother testified that she visited I.O. every other week for six hours, and they would watch TV, eat, or play. She spoke to I.O. on the phone "everyday or every other day when I do have a phone." They would talk about school, but mother did not know I.O.'s teacher's name. Mother did not elaborate how often she lacked a telephone. When counsel asked mother if I.O. was close to any maternal relatives, the court sustained the Department's objection that I.O.'s relationship with maternal relatives was not relevant to the question of I.O.'s adoptability or the parental relationship between mother and I.O.

Mother's counsel argued that mother's regular and consistent contact with I.O. supported the parental relationship exception and asked the dependency court not to terminate mother's parental rights. I.O.'s counsel pointed to evidence contradicting mother's testimony about the frequency of her contacts with I.O. She also pointed out that the prospective adoptive parents have not objected to continued contact between I.O.

5

and her mother or maternal relatives. She argued that mother's relationship did not outweigh the benefit of adoption and stability for I.O. Counsel for the Department also argued that the parental relationship exception did not apply because the benefits of a continued relationship between I.O. and mother do not outweigh the benefits of adoption.

In denying the applicability of the parental relationship exception, the dependency court adopted the arguments of counsel for the Department and I.O. regarding mother's failure to meet the burden of showing the parental relationship exception applies. It stated it "is not going to repeat everything that [counsel] said, but it does point out that the caregiver . . . has indicated that she is interested in continuing contact with the relatives" so long as it does not represent any safety or boundary issues. Finding the potential interference with a continued relationship between I.O. and mother did not outweigh the benefit of adoption, the court found that no exception applied. The court terminated parental rights and ordered the Department to proceed with adoptive placement for I.O.

## DISCUSSION

### Substantial Evidence Supports the Parental Relationship Exception to Adoption Does Not Apply

Mother contends the dependency court erroneously terminated her parental rights based on insufficient evidence the benefits of adoption outweighed a continued relationship between herself and I.O. She argues that her relationship with I.O. falls within the exception to termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). We disagree.

We apply the substantial evidence standard of review when a party challenges the dependency court's determination that the exception under section 366.26, subdivision (c)(1)(B)(i) does not apply. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; compare *In re Bailey J.* (2010) 189

6

Cal.App.4th 1308, 1314-1315 [applying both substantial evidence and abuse of discretion standards of review in a two-step process]; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 [abuse of discretion standard of review].)[3] If supported by substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary result and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

Under section 366.26, subdivision (c)(1)(B)(i), if the dependency court terminates reunification services and finds the child is adoptable, it must terminate parental rights unless it "finds a compelling reason for determining that termination would be detrimental to the child due to [the circumstance that the parent has] [¶] . . . maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

The parental relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would

---

[3] "The practical differences between the two standards of review [(substantial evidence and abuse of discretion)] are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . ."' [Citations.] However, the abuse of discretion standard is not only traditional for custody determinations, but it also seems a better fit in cases like this one, especially since the statute now requires the juvenile court to find a 'compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)[(B)].) That is a quintessentially discretionary determination. The juvenile court's opportunity to observe the witnesses and generally get 'the feel of the case' warrants a high degree of appellate court deference." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child. . . .' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) The type of parent-child relationship that triggers the exception is a relationship which "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. . . .' [Citation.]" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534; accord, *In re Jasmine D.*, *supra*, at pp. 1347-1350.)

The dependency court's finding that the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i) does not apply in this case is supported by substantial evidence. First, there was substantial evidence that mother did not meet the first prong of the parental relationship exception—regular visitation and contact. (*In re C.F.*, *supra,* 193 Cal.App.4th at p. 554.) Mother's visits with I.O. while she was in foster care were sporadic, and her telephone contact was infrequent. Mother's visits became more regular once I.O. was placed with Mrs. B., but they still amounted to 12 hours per month, and the visits were always monitored by a maternal relative. The court could reasonably infer from such facts that mother's visitation and contact was insufficient to meet the requirements of the parental relationship exception.

Substantial evidence also establishes that mother did not satisfy the second prong of the parental relationship exception because her relationship with I.O. did not promote I.O.'s well-being "'to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. . . .' [Citation.]" (*In re Brandon C.*, *supra*, 71 Cal.App.4th at p. 1534.) Mother argues that because I.O. lived with her until

she was five, the value of a continued relationship is strong. This argument ignores the fact that even when I.O. was living with mother, mother was not meeting I.O.'s basic needs. "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) When I.O. was living with mother, she did not have adequate food and had to wake her mother when she was hungry. The housing her mother provided did not even have a bathroom. I.O.'s excitement at the prospect of having her own bed and her own room demonstrates the fact that her own mother was not meeting her needs. Because of her ongoing drug problems, mother never achieved unsupervised visits with I.O. She did not know the name of I.O.'s teacher, and when she visited I.O., they would eat, play, and watch television. To the extent I.O. derives some benefit from a continued relationship with her mother, it is incidental rather than significant. (See *ibid.* [incidental benefit from visits between natural parent and child insufficient to trigger exception].) We recognize that the court's action terminating mother's parental rights will mean that I.O.'s adoptive parents have the legal right to end mother's visits should they choose to do so. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 300 ["[w]e do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"].) However, we do not second-guess the dependency court's determination that the benefit of permanency outweighs any possible benefit of legally preserving the relationship between I.O. and mother. The court's determination the parental relationship exception does not apply in this case is supported by substantial evidence.

**Testimony of I.O.'s Relationship With Maternal Relatives Was Not Relevant**

The dependency court did not err in sustaining the Department's objection to testimony about I.O.'s relationship with her extended maternal relatives. We review decisions on whether to permit or exclude evidence for abuse of discretion. (*In re Cindy*

*L.* (1997) 17 Cal.4th 15, 35.)  Evidence Code section 352 permits the court to exclude evidence if the probative value of the evidence "is outweighed by the tendency to unduly prolong the proceedings and lead to extraneous issues."  I.O.'s relationship with her maternal relatives was not relevant to the matters being decided at the permanency hearing.  The purpose of the hearing was to make findings about I.O.'s adoptability and to determine whether any exception applied that would preclude termination of mother and father's parental rights.  Even if the excluded testimony had shown a strong bond between I.O. and maternal relatives, such a bond is not recognized as a reason to preclude termination of parental rights.

## DISPOSITION

The order is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

MINK, J.[*]

---

[*]      Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.